**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISON**

| | | |
|---|---|---|
| TODD A. KING, | ) | CASE NO. 1:22-cv-01372-DCN |
| | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| Plaintiff, | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| UNIT MANAGER PADILLA, CC ORITIZ, | ) | |
| | ) | **REPORT AND RECCOMENDATION** |
| Defendants. | ) | |

## I.    Introduction

Before the Court is a motion for summary judgment filed by Defendants Unit Manager Padilla ("Padilla") and Corrections Counselor Ortiz ("Ortiz"). (ECF Doc. 38). Because there are no genuine issues of material fact, I recommend the District Court GRANT Defendants' motion for summary judgment.

## II.    Procedural History

On August 4, 2022, Plaintiff Todd A. King ("King") filed a complaint with this Court pursuant to 42 U.S.C. § 1983 against Lake Erie Correctional Institution ("LAECI") Warden Fender, Assistant Warden King, Padilla, and Ortiz. (ECF Doc. 1). In his complaint, King brought claims that alleged his First, Fourth, Fifth, and Eighth Amendment rights were violated. King asserted his First Amendment claim against Ortiz and his Fourth, Fifth, and Eighth Amendment claims against all Defendants. (*Id.*).

1

On November 18, 2022, this Court dismissed King's Fourth and Fifth Amendment claims against all Defendants and dismissed the Eighth Amendment claim against Defendants Fender, King, and Ortiz. (ECF Doc. 6). As a result, the following claims remain pending: the First Amendment claim against Ortiz, and the Eighth Amendment claim against Padilla.

Padilla and Ortiz filed the present motion for summary judgment on May 15, 2024. (ECF Doc. 38). In the motion, Padilla and Ortiz argue that they are entitled to summary judgment because King failed to exhaust his administrative remedies prior to filing his complaint as required by Prison Litigation Reform Act ("PLRA"). (*Id.* at pp. 5-9). Alternatively, they argue summary judgment is proper on the merits on both the First and Eighth Amendment claims. (*Id.* at pp. 9-16). After the dispositive motion deadline had passed, King filed what is styled as a motion for summary judgment on May 31, 2024. (ECF Doc. 45). However, a review of the motion reveals it would properly be titled as a response in opposition to Defendants' motion for summary judgment and will be treated as such.

III.    **Factual Background[1]**

This action stems from an incident on May 19, 2022. (ECF Doc. 1 and 12). The parties agree that on May 19, 2022, King was asked to exit his bunk area by Ortiz. (ECF Doc. 1, ¶ 2; ECF Doc. 38, p. 3). Further, they agree that after King refused the orders of Ortiz and other prison employees, he was sprayed with pepper spray by Padilla. (ECF Doc. 1, ¶ 2; ECF Doc. 38, pp. 3-4). The parties disagree over the motivation for Ortiz and Padilla's actions and whether King exhausted his administrative remedies prior to filing this suit.

According to King, Ortiz was attempting to conduct a search of his bunk area at LAECI as retaliation for King filing grievances about Ortiz's friend which led to the friend being

---

[1] The parties have not submitted stipulated facts to the Court. Therefore, the facts recited here are those presented by the parties in their briefings.

"walk[ed] off prison grounds[.]" (ECF Doc. 1, ¶ 2). When King protested the May 19, 2022

"search" he was removed from his bunk, told to submit to handcuffs, and sprayed with pepper

spray when he refused. (*Id.*). King argues that the use of the pepper spray was an excessive use

of force because he was not a threat to anyone. (*Id.*).

Defendants assert that Ortiz instructed King to remove trash from his bunk to bring it into

compliance with prison regulations. (ECF Doc. 38, p. 3). King was told that if he refused, Ortiz

would do it for him. (*Id.*). Ortiz ordered King to exit his bunk area so that she could bring the

area into compliance with prison policy. (*Id.*). King refused. (*Id.*). Padilla arrived to assist Ortiz

and instructed King to exit his bunk area and submit to hand restraints. (*Id.*). King initially

refused but Padilla was eventually able to get King to step out of his bunk. (*Id.*). King, however,

continued to refuse to submit to hand restraints. (*Id.*). After King's repeated refusals and King

assuming a "fighting stance" Padilla sprayed King with pepper spray. (*Id.* at pp. 3-4). Prison

employees were then able to apply hand and leg restraints. (*Id.* at p. 4). He was then taken for

observation by medical staff. (*Id.*; ECF Doc. 38-1, Attachment D).

King asserts that he filed "many complaints" regarding the "harassment" he endured at

LAECI and that prison staff "refuse[d] to investigate" his complaints. (ECF Doc. 45, ¶ 4).

According to Defendants, King did not properly grieve his retaliation or excessive force claims

prior to filing this suit. (ECF. Doc. 38, p. 1; ECF Doc. 38-2, Declaration of Paul Sackett ¶ 10).

King's grievance file reveals the following pertinent grievances.

On March 18, 2022, King filed an informal complaint requesting a transfer to another

prison and stating staff have been "harassing" him and "taking" his property. (ECF Doc. 38-2, p.

112). King received a response that explained that the Department of Rehabilitation and

Corrections Bureau of Classification determines placement. (*Id.*). King escalated to a grievance,

and again asserted that staff have harassed him and taken his property. (*Id.*). King received a response that neither his complaint or grievance provided specific information related to who was harassing him or what property was taken and denied the grievance. (*Id.*). King escalated to an appeal and stated that his grievance is within the scope of "harassment by staff and the remo[v]al of [his] property and food from area due to others." (*Id.*). The appeal affirmed the decision rendered by the inspector and stated, "If you have specific details regarding harassment and/or property being taken you may file a separate complaint regarding those matters that includes the details so it can be properly investigated." (*Id.* at pp. 112-13).

On May 5, 2022, King filed an informal complaint about issues with the people in his bunk area and stating that he was searched twice within three minutes after his block officer received an anonymous tip to search the bunk area. (*Id.* at p. 108). The institution responded that inmates do not choose who is housed in their bunks and noted that on May 19, 2022, two homemade weapons were found in King's possession. (*Id.*). King took no further administrative action. (*Id.*).

On May 6, 2022, King filed an informal complaint asking to stop being issued medical passes and stated he was tired of the staff harassment he was receiving. (*Id.* at p. 106). The institution responded regarding the medical passes. (*Id.*). King took no further administrative action. (*Id.*).

On May 19, 2022, King filed an informal complaint requesting to be transferred to another prison due to his security level and staff harassment. (*Id.* at p. 103). The institution responded regarding his security level. (*Id.*). King took no further administrative action. (*Id.*).

On June 8, 2022, King filed an informal complaint about the May 19, 2022 incident at issue. (*Id.* at p. 102). In the complaint, King stated that Ortiz was harassing him and that the Unit

4

Manager sprayed him with mace after he asked to speak to a captain. (*Id.*). King requested that

Ortiz be investigated for her wrongdoing and claimed Ortiz's harassment of him was a result of

her friend's employment at the prison being terminated. (*Id.*). The institution responded that

these issues were being handled in two different grievances. (*Id.*). King escalated to a grievance

on the same day stating the issues had not been resolved and reiterated his claim against Ortiz.

(*Id.*). The institution responded, again noting that these issues were being addressed in two other

grievances. (*Id.*). King took no further administrative action. (*Id.*).

In a separate June 8, 2022 informal complaint, King claimed that his property was

missing from the May 19, 2022 incident due to Ortiz's harassment. (*Id.* at p. 101). The institution

responded, stating that Ortiz conducted a compliance check of his bunk area, and that the

contraband was listed in the contraband control slip. (*Id.*). King took no further administrative

action. (*Id.*).

On June 19, 2022, King filed two informal complaints with reference numbers

WCI0622002208 and WCI0622002209. (*Id.* at pp. 95-97). The WCI0622002209 complaint

appears to be a continuation of the WCI0622002208 complaint as one ends ". . . continue . . ."

and the other begins ". . . follow up to continued." (*Id.*). In these complaints, King stated that he

arrived at the facility on June 17, 2022 from LAECI without all of his property. (*Id.* at p. 97).

King claimed he was on a hunger strike due to unreasonable searches, harassment by Ortiz, and

being sprayed with mace by Padilla. (*Id.*). King states in his complaint that he wants to file

charges based on this conduct. (*Id* at p. 95). The institution responded, stating King came to the

prison with the property issued to him and that there would be no reimbursement for any other

items. (*Id.* at p. 97). King escalated to a grievance on June 23, 2022 and July 2, 2022 stating he

was missing property. (*Id.* at 95-97).

In WCI0622002208, the institution responded that the issue was grieved and pending appeal in WCI0622002209. (*Id.* at p. 97). King escalated to an appeal, reasserting that he was missing property, that Ortiz took it, and that he will take the issue to court "due to the assau[l]t." (*Id.*). The decision was affirmed on appeal. (*Id.*).

In WCI0622002209, the institution responded to King's escalated grievance, and stated that after the May 19, 2022 incident, King's property was inventoried, King had property in excess of prison policy limits, all excess inventory with verified ownership was packaged and offered to be sent home but King refused, and he was written a conduct report for his contraband. (*Id.* at p. 95). Furthermore, upon his arrival at the Warren facility, King signed a property record that indicated that it was a complete list of his property. (*Id.*). King's grievance was denied. (*Id.*). King appealed, stating the items that were going to be sent home were not the ones taken by Ortiz. (*Id.*). On appeal, the decision was affirmed, stating there is no evidence to establish King's purported losses or any staff negligence regarding his purported losses.  (*Id.* at pp. 95-96).

## IV.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The moving party must demonstrate "the basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted). The nonmoving party may not simply rely on the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation omitted). A reviewing court must determine

6

whether the evidence that the nonmoving party relies upon "presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

In evaluating the evidence presented on a summary judgment motion, the reviewing court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 255. Nevertheless, a court need not accept unsupported or conclusory statements as true.  *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."). The non-moving party must present specific facts to demonstrate there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

## V.    Discussion

Defendants argue that summary judgment is proper on both of King's claims because he failed to exhaust his administrative remedies prior to filing this suit. (ECF Doc. 39, pp. 5-9). In the alternative, Defendants argue that there are no genuine issues of material fact regarding King's First Amendment retaliation claim and his Eighth Amendment excessive force claim. I agree with Defendants and find that King did not exhaust his administrative remedies before filing his complaint, entitling them to summary judgment. Furthermore, in the alternative, I also find there are no genuine issues of material fact on the merits of either of his claims. Therefore, I recommend that the District Court grant Defendants' motion for summary judgment.

### A.      Failure to Exhaust

Defendants argue that they are entitled to summary judgment because King failed to exhaust his administrative remedies pursuant to the PLRA prior to filing this suit. (ECF Doc. 38, pp. 5-9).

According to the PLRA, prisoners are required to exhaust all available administrative remedies before filing an action regarding prison conditions under 42 U.S.C. § 1983 or any other federal law. 42 U.S.C. § 1997e(a). "Failure to exhaust administrative remedies is generally an affirmative defense under the PLRA and summary judgment is appropriate only if defendants establish the absence of a genuine dispute as to material fact regarding non-exhaustion." *Johnson v. Villard*, 2024 WL 1555787, at *3 (N.D. Ohio 2024) citing *Napier v. Laurel County*, 636 F.3d 218, 225 (6th Cir. 2011). A prisoner "exhausts a claim by taking advantage of each step the prison holds out for resolving the claim internally and by following the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

Attached to Defendants' motion for summary judgment is Sackett's declaration. (ECF Doc. 38-2). Sackett is the Institution Inspector for LAECI. (*Id*. at ¶ 1). In his declaration, Sackett averred that LAECI follows the inmate grievance procedure set forth in Ohio Administrative Code ("OAC") § 5120-9-31. (*Id*. at ¶ 5). The policy states that inmates may grieve "inmate complaints related to any aspect of institutional life that directly and personally affects the grievant" including "policies, procedures, conditions of confinement, or the actions of

8

institutional staff." OAC § 5120-9-31(A). In addition, the policy specifies that any alleged or

threatened retaliation against an inmate owing to the inmate's use of the grievance procedure

may be grieved through the procedure. OAC § 5120-9-31(G).

The policy also creates a three-step process for inmate grievances: (1) the informal

complaint, (2) the notification of grievance, and (3) the filing of an appeal of the disposition of

grievance. The following guidelines control the process:

> [1] Within fourteen calendar days of the date of the event giving rise to the complaint, the inmate shall file an informal complaint to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint. Staff shall respond in writing within seven calendar days of receipt of the informal complaint. If the inmate has not received a written response from the staff member within seven calendar days, the inspector may grant an additional four calendar days for response. The inspector of institutional services shall take prompt action to ensure that a written response is provided to the informal complaint within required timelines and if a response is not provided within required timelines, the informal complaint step is automatically waived and the inmate may proceed to step two . . . .

> [2] If the inmate is dissatisfied with the informal complaint response, or the informal complaint process has been waived, the inmate may file a notification of grievance with the inspector of institutional services. All inmate grievances must be filed by the inmate no later than fourteen calendar days from the date of the informal complaint response or waiver of the informal complaint step. The inspector of institutional services may also waive the timeframe for the filing of the notification of grievance, for good cause. The inspector of institutional services shall provide a written response to the grievance within fourteen calendar days of receipt. . . . If a disposition has not been rendered after a total of twenty-eight days from the receipt of the grievance, the complaint will be deemed unresolved and the inmate may proceed to step three of the process. Expedited responses shall be made to those grievances that, as determined by the inspector of institutional services, present a substantial risk of physical injury to the grievant or for other good cause.

> [3] If the inmate is dissatisfied with the disposition of grievance, the inmate may file an appeal with the office of the chief inspector. Only issues presented in an informal complaint or grievance may be raised in a grievance appeal. Grievance appeals shall contain a clear, concise statement explaining the basis for the appeal. The appeal must then be filed to the office of the chief inspector within fourteen calendar days of the date of the disposition of grievance. For good cause the chief inspector or designee(s) may waive such time limits. The chief inspector or designee(s) shall provide a written response within thirty calendar days of receipt

9

of the appeal. The chief inspector or designee(s) may extend the time in which to respond for good cause, with notice to the inmate. The decision of the chief inspector or designee is final. Grievance appeals concerning medical diagnosis or a specific course of treatment shall be investigated and responded to by a health care professional.

OAC 5120-9-31(J).

After reviewing King's grievance file, it is clear that King did not properly follow the three-step process in the grievances that specifically mentioned Ortiz and Padilla's conduct. As detailed above, King filed informal complaints that claimed harassment by prison staff. (*See e.g.* ECF Doc. 38-2, pp. 106, 112). However, his grievances were closed because King was not specific about who his complaints were lodged against, the specific details of the conduct he was complaining about, and because he did not take further action after receiving institution responses at the first or second step. (*Id.*).

The June 19, 2022 grievance does mention Ortiz and Padilla's conduct specifically. (ECF Doc. 38-2, pp. 95-97). Defendants argue that the June 19, 2022 grievances were handled as property grievances, and thus did not concern the allegations in the complaint regarding Ortiz and Padilla's conduct. (ECF Doc. 38, p. 8). I disagree. While it appears each of the institutional responses involved King's "missing property," the June 19, 2022 grievances also involve what King styled as harassment by Ortiz and the fact that Padilla sprayed him with mace. Viewing the evidence in the light most favorable to King, as is required, these grievances involved the issues before this Court in King's complaint of retaliation by Ortiz and the use of excessive force by Padilla. Furthermore, King took all three steps in the process. King brought the informal complaint, escalated to a grievance, and appealed the decision through the administrative process before ultimately being denied. I do note, however, that OAC § 5120-9-31 required King to bring his grievances within 14 days of the challenged conduct. The incident at issue occurred on May

10

19, 2022 and King filed the informal complaints on June 19, 2022. The policy does not specify what the ramifications are for a grievance if it filed late, but the Supreme Court has stated that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules . . ." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Given the fact that King did not file his grievance regarding the conduct at issue within the timeframe set out in OAC § 5120-9-331, I find that he did not properly exhaust his administrative remedies prior to filing this action. Accordingly, I recommend the District Court grant Defendants' motion for summary judgment.

### B.      Merits

In the alternative, if the District Court finds that King did exhaust his administrative remedies prior to filing his complaint, I agree with Defendants that there are no genuine issues of material fact regarding King's First and Eighth Amendment claims.

### 1.      Retaliation

To establish a claim for retaliation, plaintiffs must prove the following three essential elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). "If the prisoner can show that the defendants' adverse action was at least partially motivated by the prisoner's protected conduct, then the burden shifts to the defendants to show that they would have taken the same action even absent such protected conduct." *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010). "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment. *Thaddeus-X*, 175 F.3d at 399.

11

King argues that Ortiz searched his bunk on May 19, 2022, because he filed grievances against her friend that led to the friend's termination. (ECF Doc. 1, ¶ 2).

Looking at the first retaliation element, it is undisputed that inmates have a "First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Accordingly, "[f]iling grievances through the inmate grievance mechanism is protected conduct." *Violett v. Reynolds*, 76 F. App'x. 24, 27 (6th Cir. 2003).

Turning to the second element, the Sixth Circuit has explained that "an adverse action undertaken in retaliation for a prisoner's exercise of his or her First Amendment rights could violate the First Amendment 'if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts.'" *Bell v. Johnson*, 308 F.3d 594, 600 (6th Cir. 2002) quoting *Thaddeus-X*, 175 F.3d at 398. "[W]hile certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* The Sixth Circuit has "suggested in dicta that a retaliatory cell search and seizure of an inmate's legal documents satisfies the adverse action prong of the *Thaddeus–X* test." *Clark v. Johnston*, 413 F. App'x. 804, 815, (6th Cir. 2011) citing *Walker v. Bain,* 257 F.3d 660, 664 (6th Cir. 2001).

Finally, plaintiffs must establish a causal connection between the protected conduct and the adverse action. Where direct evidence of a prison employee's motivation is unavailable, "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Thaddeus-X*, 175 F.3d at 399. However, inmates must

12

support their allegations of retaliatory animus with "specific, nonconclusory allegations . . . that could support a jury verdict at trial." *Id*. at 399-400.

In their motion for summary judgment, Defendants do not make an argument regarding the first element, however they argue that King cannot establish that Ortiz retaliated against him when she told him to bring his bunk into compliance with the 2.4 policy "because property compliance checks/contraband control are a routine part of prison life" and thus no adverse action was taken against him. (ECF Doc. 38, pp. 3, 9). Defendants further argue under the second element that King "cannot establish that a single search by Defendant Ortiz would deter a person of 'ordinary firmness' from pursuing constitutional grievances." (*Id.* at 10). Finally, they argue that King cannot establish a causal connection between King's grievances and the May 19, 2022 search of his bunk. (*Id.*).

Ohio inmates are generally restricted to 2.4 cubic meters of property, both personal and state, unless specifically authorized otherwise. Ohio Adm. Code § 5120-9-33(B). Defendants attach ODRC Policy 61-PRP-01 to Warden Mackey's declaration to support their motion for summary judgment. (ECF Doc. 38-1, pp. 36-46). That policy reiterates the 2.4 cubic meters rule from Ohio Adm. Code § 5120-9-33. Declarations of both Warden Mackey and Ortiz state that correction officers are expected to view inmates' bunk areas daily to ensure compliance with ODRC Policy 61-PRP-01. (ECF Doc. 38-1 Mackey Declaration, ¶ 36; ECF Doc 38-3 Ortiz Declaration, ¶ 11).

Here, King alleges he engaged in protected conduct by filing grievances about Ortiz's friend and colleague which led to the friend's employment being terminated. (ECF Doc. 1, ¶ 2). King alleged that his bunk was searched on May 19, 2022 by Ortiz. (*Id.*). He further alleges that this protected conduct motivated Ortiz to target him for the May 19, 2022 search of his bunk.

13

(*Id.*). However, King does not provide the type of specifics necessary to support his allegations of retaliation. For example, he is not specific about the identity of Ortiz's alleged friend he filed grievances about, how those grievances led to the alleged friend being fired, or when he filed the grievances about Ortiz's alleged friend. Therefore, I find that King has not supported his allegations of retaliatory animus with specific, nonconclusory allegations. *Thaddeus-X*, 175 F.3d at 399. Furthermore, Defendants have demonstrated that Ortiz would have taken the same actions that day because ensuring that bunks are in compliance with prison policies was one of her tasks at the prison. (ECF Doc. 38, p. 11; ECF Doc. 38-1 Mackey Declaration, ¶¶ 33-43; ECF Doc 38-3 Ortiz Declaration, ¶¶ 4, 11-15).

Accordingly, I recommend Defendants' motion for summary judgment be granted on King's retaliation claim.

### 2. Excessive Force

King asserts that Padilla used excessive force against him during the May 19, 2022 incident and as a result violated his Eighth Amendment Rights. I disagree.

The "'core judicial inquiry'" in an excessive force claim is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010), quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

The Sixth Circuit has previously affirmed a district court's grant of summary judgment in favor of prison staff who administered pepper spray on an inmate after the inmate repeatedly disobeyed the officers' orders. *Jennings v. Mitchell*, 93 Fed. Appx. 723, 725 (6th Cir. 2004). The *Jennings* Court found that summary judgment was proper on the inmate's Eighth Amendment

14

claim because video evidence demonstrated that the officers' actions were done in a good-faith effort to maintain or restore discipline and not done to maliciously cause pain. *Id.*

The facts of this case are strikingly similar. Here, Warden Mackey's declaration and video evidence marked as Attachment A to that declaration demonstrate that Ortiz asked King to bring his bunk into compliance based on her assertion that he had more than 2.4 cubic meters of personal and state property. (ECF Doc. 38-1 Mackey Declaration, ¶¶ 22 and 37; Attachment A). When King refused, the video shows Ortiz, Padilla, and Foster repeatedly asking King to step out of his bunk area and further to submit to arm restraints so that Ortiz could bring the bunk area into compliance. (ECF Doc. 38-1, Attachment A). After several requests, King finally exited the bunk area, but refused to submit to arm restraints. (*Id.*). When Padilla attempted to grab King's wrist to place the arm restraints, King broke away and then assumed a fighting stance and told Padilla to "Back the f**k up." (*Id.*). It was at that time that Padilla sprayed King with pepper spray and again attempted to put King into arm restraints. (*Id.*). It is worth noting that King does not dispute that he failed to obey prison staff's orders. In fact, King admits in his complaint that when Ortiz asked him to step out of his bunk he refused. (ECF Doc. 1, ¶ 2).

After Padilla sprayed King, he continued to resist submitting to hand restraints leading Foster to spray King with pepper spray. (ECF Doc. 38-1, Attachment A). As mentioned previously, King's excessive force claim is against Padilla alone. After the second spray by Foster, guards were able to get hand and leg restraint on King. (ECF Doc. 38-1, Attachment A). Bodycam footage then shows King being transported to the prison medical center where he was able to wash his eyes out in between a nurse's evaluation for approximately 14 minutes. (ECF Doc. 38-1, Attachment A). The medical report from this encounter was attached to Defendants'

motion for summary judgment as Attachment D to Warden Mackey's declaration. (ECF Doc. 38-1, Attachment D).

In King's response to Defendants' motion for summary judgment, he argues that there is video evidence missing. (ECF Doc. 45, ¶ 2). However, a review of the video shows the incident before Padilla arrived at King's bunk area, Padilla arriving at the bunk area, King refusing Padilla's orders, and Padilla ultimately spraying King with pepper spray. (ECF Doc. 38-1, Attachment A). Therefore, because King's entire interaction with Padilla during the May 19, 2022 incident is included, King has not demonstrated how any additional video would create a genuine issue of material fact precluding summary judgment.

Accordingly, the summary judgment evidence demonstrates that Padilla spraying King with pepper spray was done in a good-faith effort to maintain or restore discipline and not to maliciously cause pain. Therefore, summary judgment is proper on King's Eighth Amendment excessive force claim.

## VI.     Conclusion

For the foregoing reasons, I recommend that the District Court GRANT the Defendants' motion for summary judgment.

Dated: August 23, 2024

Reuben J. Sheperd
United States Magistrate Judge

### OBJECTIONS

### <u>Objections, Review, and Appeal</u>

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28

U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).